IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.<br>  DELBERT HEARD,<br><br>       Petitioner,<br><br>          v.<br><br>JOSEPH MATHY, Acting Warden,<br><br>       Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 08 C 3097<br><br>  The Honorable<br>  David H. Coar,<br>  Judge Presiding. |

## ANSWER

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, respondent JOSEPH MATHY submits his answer to petitioner's petition for writ of habeas corpus and states as follows:

1.     Petitioner Delbert Heard, identified as prisoner B76789, is in respondent's custody at Pontiac Correctional Center in Pontiac, Illinois.

2.     On March 6, 1996, a jury in the Circuit Court of Cook County convicted petitioner of three counts of first degree murder.  Finding no mitigating factors sufficient to preclude the imposition of the death penalty, the trial court sentenced petitioner to death.[1]  *See* Pet. at 1; *see also* Exh. D,  718 N.E.2d 58, 65, 67-68 (*People*

---

[1]  Petitioner waived a jury for his death sentencing hearing.  *See Heard*, 718 N.E.2d at 68.

*v. Heard*, 718 N.E.2d 58 (Ill. 1999)).[2]

3.     During his direct appeal, the state supreme court summarized the

following facts regarding petitioner's crimes, which are presumed to be correct on

federal habeas review absent "clear and convincing" evidence to the contrary.

*Williams v. Bartow*, 481 F.3d 492, 498 (7th Cir. 2007) (citing 28 U.S.C. § 2254(e)(1));

*see also* 28 U.S.C. § 2254(d)(2); *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981);

*Mendiola v. Schomig*, 224 F.3d 589, 592-93 (7th Cir. 2000) (state reviewing court's

factual findings are entitled to same deference afforded state trial court findings).

> The evidence adduced at trial showed that on November
> 11, 1992, Natalie Wilson, Natalie's 10-year-old daughter,
> Tanquinka (nicknamed TQ), and Natalie's cousin, Zita
> Jones, lived in a first-floor apartment behind a storefront
> at 136 East 118th Street in Chicago. At the time of the
> murders, Kenneth Seals was Natalie's boyfriend, and
> Natalie was pregnant with Kenneth's child. Natalie and
> Kenneth began their relationship in April of 1992.
> Previously, [petitioner] (nicknamed Heavy) had been
> Natalie's boyfriend for approximately five years.
> Sometime in 1992, Natalie and [petitioner] ended their
> relationship.
>
> TQ testified that, on November 10, 1992, at
> approximately 8 p.m., [petitioner] knocked on the front
> door of Natalie's apartment and asked if he could enter.
> Natalie, Kenneth, and TQ were all in the apartment.
> When Natalie told [petitioner] that he could not come into
> the apartment, [petitioner] replied, "I'm not going to hurt
> you." [Petitioner] asked where TQ was, stating that he
> wanted to buy some of the candy that TQ was selling for a

---

[2]  Petitioner's death sentence was later commuted to a term of natural life by then-
Governor Ryan. *See People ex rel. Madigan v. Snyder*, 804 N.E.2d 546, 550 (Ill.
2004).

school fundraiser.  Natalie told [petitioner] that TQ was not home.  Kenneth did not say anything to [petitioner].  [Petitioner] kicked the door and left.

TQ then bathed and went to bed.  TQ's bedroom was next to Natalie's bedroom.  There was no heat in TQ's room because the radiator was in Natalie's room.  The door that led from TQ's room to Natalie's room was therefore kept open.  Later that evening, TQ heard the side door unlock, and heard Zita and her boyfriend talking and laughing.  Zita and her boyfriend went into Zita's bedroom.  TQ later heard Zita and her boyfriend walk back to the side door and unlock it.  TQ heard the door lock again and then heard Zita walk back to her bedroom.

As TQ was going back to sleep, she heard the door unlock again, slower this time, and she heard the floor squeak.  After hearing these noises, TQ saw [petitioner] standing at the foot of Natalie's bed.  TQ heard [petitioner] exchange words with Natalie and Kenneth, and heard [petitioner] say, "Don't try it."  TQ heard gunshots and saw [petitioner] lean over Natalie and Kenneth.  According to TQ, [petitioner] had a long black gun, and sparks were coming from it.  TQ heard about 25 or 30 shots coming from her mother's room.  TQ then heard Zita screaming and the floor squeaking again. [Petitioner] went to Zita's room, and TQ heard more gunshots.  TQ then heard the floor squeaking very fast and the outside gate rattle.

At this point, TQ arose from her bed and went into her mother's bedroom.  TQ asked Natalie if she was okay.  Natalie tried to lift her head but did not respond.  Kenneth had been moaning, but the moaning stopped.  TQ went to Zita's room.  Zita was lying down with "a hole in her head" and "stuff" coming out of her neck.

TQ called the police and ran upstairs to get help from the landlords, Monique and Melvin DeYoung.  Mrs. DeYoung testified regarding the events of the evening.  On November 10, 1992, the DeYoungs went to sleep at approximately 10 p.m.  They were later awakened by gunfire.  Mrs. DeYoung heard heavy footsteps and then

3

heard the kitchen door to Natalie's apartment slam.  Mrs. DeYoung heard moaning from the first floor.

Mrs. DeYoung testified that TQ came into Mrs. DeYoung's bedroom.  TQ's eyes were "bugged," and she was shaking.  TQ told Mrs. DeYoung that "somebody shot my mama" and "something" was coming out of Natalie's eye.  TQ stated that she tried to wake Natalie and Kenneth, but that Natalie would not wake up, and Kenneth said "huh" and then died.  TQ told Mrs. DeYoung that she next went to Zita's room, but Zita had "something" coming out of her eye and was dead.

TQ and Mrs. DeYoung went to Natalie's apartment.  Paramedics and police officers were in the apartment.  TQ tried to get back to Natalie.  When the police officers would not let TQ into the area, TQ became very upset and began mumbling to herself.  Mrs. DeYoung heard TQ say, "Man, why did Heavy shoot my mama?"  When Mrs. DeYoung asked TQ if she saw [petitioner], TQ said, "Man, why did he shoot my mama?  I didn't see nothing.  I didn't see nothing Mrs. DeYoung."  Mrs. DeYoung described TQ as "very shaken," "concerned," "frightened," and "in shock."

Mary Pearson, the common law wife of [petitioner's] second cousin as well as the sister-in-law of Natalie, also testified regarding her arrival at the crime scene.  When Mary entered the apartment, TQ ran to her and said, "Auntie Net, he gon [sic] killed my mother."  When Mary asked TQ who killed Natalie, TQ hugged Mary but did not answer Mary's question.  Mary and TQ then went with detectives in an attempt to find [petitioner].  The group went to [petitioner's] house, [petitioner's] parent's house, [petitioner's] sister's house, and the garage where [petitioner] parked his tow truck.  At each location, TQ laid down in the backseat of the car as if she did not want to be seen.  When the detectives pulled up in front of [petitioner's] parent's home, TQ told Mary, "He gon [sic] see us" and TQ began to cry.  The day after the crimes occurred, [petitioner] learned that the police were looking for him, and he then went to the police station.

4

Chicago Police Officer John Butler, a forensic investigator, testified regarding his processing of the crime scene. In one bedroom, Natalie and Kenneth's bodies were on the bed. In a second bedroom, Zita's body was on the bed. The victims had been shot numerous times. The police recovered a total of 32 cartridge cases from Natalie's apartment. All of the cartridge cases were 9-millimeter Luger FC. The police found a set of keys in the outside kitchen door. No fingerprints suitable for comparison were recovered from the keys. The police also found a Taurus .380 semiautomatic pistol on the window sill closest to Kenneth's body.

Assistant Chief Medical Examiner Dr. Mitra Kalelkar testified regarding her performance of the autopsies on the victims' bodies. The victims died from multiple gunshot wounds. Natalie and Zita were shot 5 times, and Kenneth was shot 17 times. Natalie was six to eight weeks pregnant.

After the prosecution rested, [petitioner] presented the testimony of Alonzo Williams, Tina Coleman, and Kimberly Nelson. Alonzo Williams, [petitioner's] friend, and Tina Coleman, [petitioner's] fiancee, testified that they were with [petitioner] on the night of the murders. Alonzo stated that on November 10, 1992, he met [petitioner] and Tina at approximately 10 p.m. at a bowling alley. According to Alonzo, the group stayed at the bowling alley until 1:30 a.m. and then went to a restaurant until 2:30 a.m.

Tina testified that she was engaged to [petitioner], and that he is the father of her son. According to Tina, at 9:30 p.m. on November 10, 1992, [petitioner] picked her up, and they met some of [petitioner's] friends at a bowling alley. Tina stated that her sister paged her at about 1:30 a.m., and that she called her sister back from the bowling alley. Tina, [petitioner], and [petitioner's] friends left the bowling alley at about 1:30 a.m. and went to a restaurant, where the group stayed until 2:30 a.m. Tina stated that she and [petitioner] went to a hotel because [petitioner] had overnight company at his apartment. They stayed at the hotel until 7 a.m.

Kimberly Nelson, Tina's sister, testified that, on November 11, 1992, at about 1:30 a.m., she talked to Tina on the phone. Tina called Kimberly after Kimberly paged her. Kimberly stated that she could hear that Tina was at a bowling alley because she heard pins in the background. Kimberly also stated that she heard [petitioner] talking in the background.

The jury returned a verdict of guilty against [petitioner] on three counts of first degree murder. At this stage in the proceedings, [petitioner] obtained a new attorney. [Petitioner's] new attorney filed a post-trial motion for judgment of acquittal or a new trial. The trial court denied [petitioner's] motion. [Petitioner] waived a jury for the death sentencing hearing. The trial court found [petitioner] eligible for the death penalty based upon the statutory aggravating factor that [petitioner] murdered two or more individuals. 720 ILCS 5/9-1(b)(3) (Citation omitted).

At the aggravation-mitigation phase of the death penalty hearing, the State presented a number of victim impact statements from the families of the victims. The prosecution also presented the testimony of Chicago Police Officer Allan Garant. Officer Garant testified that on October 11, 1989, he and his partner followed [petitioner] and another individual. [Petitioner], with a coat hanger, made a downward motion near a car. [Petitioner] opened the car door, and the other individual entered the car. [Petitioner] stood near the car, moving his head from left to right, and looking around. Two to three minutes later, the individual exited the car, and he and [petitioner] started to walk back to their car. [Petitioner] was arrested for burglary and possession of burglary tools, and he later pled guilty to a reduced misdemeanor charge.

In mitigation, [petitioner] called 12 individuals to testify and presented affidavits from 33 persons. These people included family, friends, business associates, school authorities and prior teachers, and inmates and jail personnel. All of these witnesses described [petitioner] as

6

a hardworking, caring, and nonviolent person. [Petitioner's] family was described as close, supportive, and religious. Some witnesses recounted specific instances when [petitioner] helped them during a financial or emotional crisis. Other witnesses relayed that [petitioner] was never involved in a gang, and stayed away from drugs and alcohol.

The trial court recognized that a statutory mitigating factor existed, *i.e.,* that [petitioner] has no significant history of criminal activity. (Citation omitted). After considering evidence in aggravation and mitigation, however, the trial court found no mitigating factors sufficient to preclude imposition of the death penalty and sentenced [petitioner] to death for the murder of the three victims.

*See* Exh. D, 718 N.E.2d at 65-68.

4.    Petitioner appealed, raising 14 claims to the state supreme court:

(a)    *Batson v. Kentucky*, 476 U.S. 76 (1986) was violated when the State challenged five black venirepersons (*see* Exh. D at 68-70);

(b)    counsel was ineffective for exercising a peremptory challenge to exclude Dahnetta Ousley, a black woman (*id.* at 70);

(c)    evidence of other crimes was wrongfully admitted; specifically, several violent episodes involving Natalie (*id.* at 70-73);

(d)    the State introduced evidence of a prior threat without first disclosing it to the defense (*id.* at 73-74);

(e)    various hearsay statements were admitted into evidence (*id.* at 74-77);

(f)    the trial court limited the defense's rehabilitation of Alonzo Williams and Tina Coleman, two alibi witnesses (*id.* at 77-78);

(g)     prosecutorial misconduct where the State:

    (i)     solicited prejudicial testimony that the State unsuccessfully sought petitioner when it knew that he voluntarily surrendered to authorities;

    (ii)    commented on his appearance at trial; and

    (iii)   referred to testimony regarding the "familial relationships, personal traits and peaceful character" of the victims (*id.* at 78-80);

(h)     the State failed to correct false testimony (*id.* at 80);

(i)     he was denied a fair trial because the State presented, and the trial court published, five gruesome autopsy photographs and crime scene photographs to the jury (*id.* at 80-81);

(j)     deprivation of his sixth amendment right of confrontation by limits placed on his cross-examination of TQ (*id.* at 81-82);

(k)     he was denied a fair trial when jury deliberations were allowed to continue while requested trial transcripts were being prepared (*id.* at 82-83);

(l)     ineffective assistance of trial counsel because counsel:

    (i)     failed to impeach certain testimony of Monique DeYoung;

    (ii)    failed to impeach certain testimony of Mary Pearson;

    (iii) and (iv)  failed to impeach testimony of various police officers;

    (v) through (viii)  failed to impeach certain testimony of TQ;

    (ix)    failed to request a jury instruction on weighing the credibility of an eyewitness;

8

(x)    made certain promises in his opening
statement that he failed to keep;

(xi)    failed to obtain psychological reports on TQ
where counsel knew TQ had been to a
psychologist;

(xii)    tricked petitioner into waiving his right to
testify;

(xiii)    failed to rebut the State's theory that TQ did
not identify him earlier because she was
afraid of him; and

(xiv)    acknowledged that the State could correct
his arguments during its rebuttal (*id.* at 82-
84);

(m)    insufficient evidence to prove guilt beyond a reasonable
doubt (*id.* at 84-85); and

(n)    various claims on the propriety and constitutionality of Illinois's
death penalty statute (*id.* at 85-90).

*See also* Exh. A (Petitioner's Brief, *People v. Heard*, 718 N.E.2d 58 (1999)); Exh. D.

On June 17, 1999, the state supreme court affirmed.  *See* Exh. D.

5.    Petitioner filed a petition for writ of certiorari to the United States

Supreme Court.  *See* Exh. E (petition for writ of certiorari, *Heard v. Illinois*, No. 99-

1117).  On March 6, 2000, the Supreme Court denied the petition.  *See* Exh. F

(denial of petition for writ of certiorari, *Heard v. Illinois*, No. 99-1117).

6.    Meanwhile, on December 18, 1997, petitioner filed a pro se

postconviction petition in the Circuit Court of Cook County pursuant to 725 ILCS

5/122-1, *et seq.*  *See* Pet. at 3, ¶1(B)-(C); Exh. J (Order, *People v. Heard*, No. 1-05-

0209 (Ill. App. 2007) (modified upon denial of petition for rehearing)).  After

petitioner expressed dissatisfaction with appointed counsel (three amended

postconviction petitions had already been filed), the circuit court allowed him to

proceed pro se, and petitioner argued:

(a)    prosecutorial misconduct because the State concealed
       material evidence that could have been used to impeach
       TQ and show that she offered  perjured testimony;

(b)    ineffective assistance of trial counsel;

(c)    ineffective assistance of appellate counsel; and

(d)    actual innocence based on newly discovered evidence: an
       affidavit from a person who swore that he saw "a dude
       with a machine gun run past him" on the night of the
       murder, implying that the "dude" was the actual
       murderer.

See Exh. J at 6-7.  The  court subsequently dismissed petitioner's postconviction

petition.

7.    Petitioner appealed and argued that the circuit court erred by:

(a)    refusing to allow disclosure of certain psychological
       records of TQ; and

(b)    dismissing his postconviction petition without an
       evidentiary hearing because he had made a substantial
       showing of actual innocence.

See Exh. J at 1.  On February 2, 2007, the state appellate court affirmed.  Id.

8.    In his postconviction PLA, petitioner raised one issue: the state

appellate court erred in affirming the dismissal of his postconviction petition

because he had made a substantial showing of actual innocence.  See Exh. H (PLA,

10

*People v Heard*, No. 104366).  The state supreme court denied the PLA on May 31,

2007.  *See* Exh. L (Order, *People v. Heard*, No. 104366).  Respondent has confirmed

that petitioner did not file a petition for writ of certiorari to the Supreme Court.

     9.    On May 29, 2008, petitioner filed the instant petition for habeas corpus

relief pursuant to 28 U.S.C. § 2254, raising the following claims:

     (a)    trial counsel was ineffective for:

        (i)    failing to request Illinois Criminal Pattern
            Jury Instruction (IPI) 3.15 on witness
            identification;[3] and

---

[3]  At the time of petitioner's trial, IPI criminal No.3.15 stated:

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

    [1] The opportunity the witness had to view the offender at the time of the offense.

                [or]

    [2] The witness's degree of attention at the time of the offense.

                [or]

    [3] The witness's earlier description of the offender.

                [or]

    [4] The level of certainty shown by the witness when confronting the defendant.

                [or]

    [5] The length of time between the offense and the identification confrontation."

(Brackets in original.) IPI criminal No. 3.15 (3d ed. 1992).

(ii)     instructing alibi witnesses not to tell law
enforcement officials of his alibi;

(b)     he was denied due process under *Crane v. Kentucky*, 476
U.S. 683 (1986), because the trial court barred
rehabilitative testimony of his alibi witnesses; and

(c)     he was denied due process under *Davis v. Alaska*, 415
U.S. 308 (1974), because he was denied his right to fully
cross-examine TQ.

*See* Pet. at 5-6.

10.     Petitioner has exhausted his state remedies as required by 28 U.S.C.

§ 2254(b) since he has no further state court avenues of review on the issues raised

in his habeas petition.  *See* 725 ILCS 5/122-1, *et seq.*   Pursuant to Rule 5 of the

Rules Governing Section 2254 Cases in the United States District Courts,

respondent has manually filed the following state court materials under separate

cover:

Exhibit A:    Petitioner's brief, *People v. Heard*, No.
81443;

Exhibit B:    State's brief, *People v. Heard*, No. 81443;

Exhibit C:    Petitioner's reply brief, *People v. Heard*, No. 81443;

Exhibit D:    Opinion, *People v. Heard*, 718 N.E.2d 58 (1999);

Exhibit E:    Petition for writ of certiorari, *Heard v.
Illinois*, No. 99-1117;

Exhibit F:    Order denying petition for writ of certiorari,
*Heard v. Illinois*, No. 99-1117;

Exhibit G:    Petitioner's brief, *People v. Heard*, No. 1-05-
0209;[4]

Exhibit H:    State's brief, *People v. Heard*,  No. 1-05-0209;

Exhibit I:    Petitioner's reply brief, *People v. Heard*,  No. 1-05-
0209;

Exhibit J:    Rule 23 Order, *People v. Heard*, No. 1-05-
0209 (Ill. App. 2007);

Exhibit K:    PLA, *People v. Heard*, No. 104366;

Exhibit L:    Order, *People v. Heard*, No. 104366 (Ill.
2007); and

Exhibit M:    State court record, *People v. Heard*, 96 CR 1456,
Circuit Court of Cook County.

For the following reasons, petitioner is not entitled to habeas corpus relief.

## Arguments in Opposition to the Petition

### A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), this

Court may grant habeas relief only if the state court's "decision was contrary to, or

involved an unreasonable application of, Supreme Court precedent," or "resulted in

a decision that was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding." *Virsnieks v. Smith*, 521 F.3d

707, 713-714 (7th Cir. 2008);  28 U.S.C. § 2254(d)(1)-(2).  To grant habeas relief

under the "contrary to" clause, a habeas court must find that the state court

---

[4]  Petitioner sought leave to file a pro se amended brief raising an additional eight
issues to supplement those raised in his counseled brief.  The state appellate court
denied his motion.

reached a result opposite to that reached by the Supreme Court on materially

indistinguishable facts. *See Williams v. Taylor,* 529 U.S. 362, 405 (2000); *Jackson*

*v. Miller,* 260 F.3d 769, 774 (7th Cir. 2001).

To obtain relief under the "unreasonable application" clause, a habeas

petitioner must show that the state court's decision unreasonably applied clearly

established Supreme Court precedent by unreasonably extending a rule to a context

where it should not have applied or by unreasonably refusing to extend a rule to a

context where it should have applied. *Jackson,* 260 F.3d at 774. Federal courts

presume the state court's factual findings are correct, and this presumption may be

rebutted only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Miller-*

*El v. Cockrell,* 537 U.S. 322, 348 (2003); *Barrow v. Uchtman,* 398 F.3d 597, 603 (7th

Cir. 2005). In short, the state court decision must be "both incorrect *and*

unreasonable." *Washington v. Smith,* 219 F.3d 620, 628 (7th Cir. 2000); *see also*

*Williams,* 529 U.S. at 407-08.

## B.    Ineffective assistance of trial counsel

Petitioner first claims that he was denied effective assistance of trial counsel

because counsel: (a) failed to request IPI criminal No. 3.15 on witness identification;

and (b) wrongly instructed witnesses Coleman and Williams not to discuss his alibi

with law enforcement officials. *See* Pet. 5, §3(A)-(B). Petitioner's ineffective

assistance claims provide no reason for habeas relief.

### 1.   **Relevant Principles**

_____The Sixth Amendment guarantees criminal defendants the right to effective

assistance of trial counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (1984).

*Strickland* is "clearly established" Supreme Court precedent. *Williams*, 529 U.S. at

391 (2000); 28 U.S.C. § 2254(d).  In raising an ineffective assistance claim,

petitioner must identify specific acts or omissions by counsel, and the court

evaluates the allegations using a two-prong test:  (1) whether counsel's performance

fell below the objective standard of reasonable representation under the

circumstances; and (2) whether there is a reasonable probability that, but for the

errors, the proceeding would have had a different result. *Strickland*, 466 U.S. at

688, 690, 694.  Under § 2254(d), a petitioner "must do more than show that he

would have satisfied *Strickland*'s test if his claim were being analyzed in the first

instance, because under § 2254(d)(1), it is not enough to convince a federal habeas

court that, in its independent judgment, the state-court decision applied *Strickland*

incorrectly.  Rather, he must show that the [state appellate court] applied

*Strickland* to his case in an objectively unreasonable manner." *Bell v. Cone*, 535

U.S. 685, 698-99 (2002) (internal citations omitted); *see also Johnson v. Loftus*, 518

F.3d 453, 457 (7th Cir. 2008) (*Strickland* review of counsel's performance is "highly

deferential" even before § 2254(d)(1) deference is added); *Holman v. Gilmore*, 126

F.3d 876, 881 (7th Cir. 1997) ("*Strickland* builds in an element of deference to

counsel's choices in conducting the litigation; § 2254(d)(1) adds a layer of respect for

a state court's application of the legal standard"); *see also Stevens v. McBride*, 489

F.3d 883, 906 (7th Cir. 2007) (quoting *Holman*).

### 2.    Trial counsel's failure to request IPI Criminal  No. 3.15

Petitioner first contends that trial counsel was ineffective for failing to

request IPI Criminal No. 3.15 regarding the evaluation of identification testimony,

and that the omission "resulted in prejudice to me sufficient to undermine

confidence in the outcome of my trial."  *See*  Pet. 5, §3(A).  This claim lacks merit.

Before the state supreme court, among other grounds of ineffective

assistance of counsel, petitioner asserted that counsel should have tendered IPI

criminal No. 3.15 because the credibility and reliability of TQ's testimony were in

doubt considering the length of time (14 months) that had elapsed between the

crime and her identification of petitioner.  *See* Exh. A at 96-98.  Petitioner further

asserted that because the jury received only the "garden variety" credibility

instruction (IPI criminal No. 1.02),[5]  counsel's inaction denied him a fair trial.  *See*

---

[5]  At the time of petitioner's trial, IPI criminal No. 1.02 stated:

"You are the sole judges of the believability of the witnesses and of the weight to be given to the testimony of each of them.  In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

IPI criminal No. 1.02 (3d ed. 1992).

Exh. A at 97.

After correctly citing *Strickland* as the applicable standard to claims of ineffective assistance of counsel (*see* Exh. D, 718 N.E.2d at 68), the supreme court held that counsel was not ineffective:

> [Petitioner] fails to establish a reasonable probability that, but for these alleged instances of ineffective assistance of counsel, the outcome of [petitioner's] trial would have been different.  (Citing *Strickland*).

*Id*. at 84.  Petitioner is not entitled to habeas relief because he cannot show that the state court's application of *Strickland* was either "contrary to" or an unreasonable application of that case's holding.  28 U.S.C. § 2254(d)(1).

Petitioner's claim lacks merit under § 2254(d).  The state supreme court correctly acknowledged that an attorney's performance is assessed under the two-pronged standard set forth in *Strickland*, and accurately stated that standard. Therefore, its decision was not contrary to *Strickland*.  *See Eckstein v. Kingston*, 460 F.3d 844, 851 (7th Cir. 2006) (as long as reasoning of state court is consistent with *Strickland*, decision is not contrary).

Nor was the state supreme court's holding — that petitioner had not shown that he was prejudiced by trial counsel's decision not to tender IPI criminal No. 3.15 — an unreasonable application of *Strickland*.   Petitioner's identification was not really an issue at petitioner's trial; TQ was very familiar with petitioner.  TQ's

mother and petitioner had dated for five years preceding the murder, and petitioner had lived with them.  *See* Exh. D at 65; Exh. M at R-1034.  Because TQ was so well acquainted with petitioner, there is little chance that the verdict would have differed had the instruction been given.

In any event, the state court's rejection of this claim was objectively unreasonable.  If IPI criminal No. 3.15 had been tendered, it would have weighed greatly *against* petitioner.   The preface to the instruction stated, "When you weigh the identification testimony of a witness, you should consider *all of the facts and circumstances in evidence*, including, *but not limited to*, the [five factors listed].  *Supra* at 11.  (Emphasis added).   By giving the jurors an additional instruction that required them to reexamine TQ's evidence *vis-a-vis* the evidence as a whole, petitioner would have asked the jury to reconsider that

— he had recently broken up with Natalie (Exh. D, 718 N.E.2d at 65);

— Natalie was pregnant at the time of the shooting by Seals (*Id.*);

— he had come to the apartment the previous day and told Natalie that he was "not going to hurt her," but after not being allowed in, kicked at the door  (*Id.* at 65-66);

— TQ saw him standing at the foot of Natalie's bed at the time of the murder  (*Id.* at 66);

— TQ heard him exchange words with Natalie and Seals and say "don't try it"  (*Id.*);

— TQ heard gunshots and saw him with a long black gun
with sparks coming from it. At the time, he was leaning
over Natalie and Seals  (*Id*.);

— TQ heard Zita scream, petitioner going to Zita's room,,
and more gunshots before he left the building (*Id*.);

— TQ discovered the bodies of all three victims (*Id*.);

— the landlord, Monique DeYoung and Mary Pearson
described TQ's emotions and actions at the scene, in the
police car searching for petitioner, and later at the police
station, all of which explained in horrific detail a 10-
year-old's description of her mother (and others) being
slain by a person she was very familiar with  (*Id*. 66-67);

— the forensic investigator gave a detailed description of
the scene which was consistent with TQ's testimony  (*Id*.
at 67); and

— the medical examiner found that Natalie and Zita were
shot five times and Kenneth was shot 17 times.  (*Id*.).

Reviewing such testimony under the rubric of IPI criminal No. 3.15 would have

served only to reinforce the horrific nature of petitioner's crime and petitioner's

connection with it.  Petitioner further claims that the failure to tender the

instruction meant that the jury convicted him without "constitutionally relevant

evidence" (*see* Pet. Mem. at 3).  But he makes no effort to explain what that

evidence consisted of, and such a claim is entirely different claim from failure to

tender an instruction.

Under such circumstances, where TQ was personally acquainted with petitioner,[6] there is no reasonable probability that petitioner would have been acquitted had IPI criminal No. 3.15 been tendered.  Therefore, because petitioner cannot show that he was prejudiced by counsel's failure to submit the jury instruction, he is not entitled to habeas relief.  The state supreme court's rejection of this claim was a correct application of *Strickland*; at the very least, its application was not objectively unreasonable under § 2254(d).

Moreover, petitioner's lawyer's failure to request IPI criminal No. 3.15 was not deficient performance.  The Committee Note to IPI criminal No. 3.15 recommend that the instruction be given when identification is an issue.  *See* to IPI criminal No. 3.15, Committee Note.  But, as explained, identification was not really in dispute.  TQ had known petitioner for years.  Since identification was not an issue, petitioner's lawyer was not ineffective for not requesting the instruction that was not mandated for such circumstances.

---

[6] That TQ knew petitioner is one of a number of factors which distinguish this case from those cited by petitioner — *United States v. Hodges*, 515 F.2d 650 (7th Cir. 1975) and *United States v. Anderson*, 739 F.2d 1254 (7th Cir. 1984).  In addition, those defendants were not alleging ineffective assistance, and neither case was a habeas case applying AEDPA's standards.

3. **Trial counsel's instruction to the witnesses that they not discuss petitioner's alibi with law enforcement officials**

Petitioner also asserts that counsel was ineffective for instructing his alibi witnesses, Alonzo Williams and Tina Coleman, not to discuss his supposed alibi with law enforcement officials. *See* Pet. 5, §3(B). As a result of this advice, petitioner opines, the prosecution was able to convince the jury that Williams and Coleman lacked credibility by forcing them to admit on cross-examination that they had not been forthcoming with authorities. *See* Pet. Mem. at 4-5. Petitioner suggests that if his attorney had allowed these witnesses to cooperate fully, he would have been acquitted because the prosecution could not have impeached them. *Id.* Petitioner's claim is baseless.

In its opinion, the state supreme court held that petitioner "failed to establish that, but for counsel's alleged deficient performance, the outcome of the trial would have been different." *See* Exh. D, 718 N.E.2d at 78. This holding — that petitioner cannot show prejudice by counsel's supposed instructions to Williams and Coleman — was not an unreasonable application of *Strickland*'s prejudice prong.

Williams and Coleman each testified that petitioner was bowling with them on the night of the murders. *Id.* at 67. During cross-examination, Williams admitted that he did not tell the police or prosecutor about petitioner's activities on

the night in question, but did tell counsel of petitioner's whereabouts.  *See* Exh. M,

R. 1160-1165.  Coleman testified that she never contacted any law enforcement

agency, but had told counsel about petitioner's alibi.  *See id*. at 1169-1175.

Petitioner cannot establish *Strickland* prejudice from counsel's alleged

instructions to Williams and Coleman.  First, it should be remembered that his

alibi evidence *was* presented to the trier of fact.  Further, the jurors were informed

that the witnesses had told petitioner's attorney about these circumstances.  So,

the only question is whether there is a reasonable probability that if the jurors had

also been aware of the lawyer's alleged advice to Williams and Coleman, the

verdict would have been different.  Petitioner cannot make such a showing.

Petitioner alleges that his witnesses were "discredited" because they were forced to

concede that they did not tell law enforcement authorities of the alibi.  *See* Pet.

Mem. at 4.  But petitioner fails to mention that a third alibi witness, Kimberly

Nelson, *also* testified on his behalf, stating that she talked to Coleman on the

phone from the bowling alley and heard petitioner in the background.  *See* Exh. D,

718 N.E.2d  at 67.  Petitioner makes no allegation that Nelson's testimony was

discredited in this way.  It is unlikely in the extreme that having two more of his

alibi witnesses not discredited with this information would have made the alibi

more palatable to the jury.

Second, that Williams and Coleman were discredited by conceding that they

did not tell law enforcement of the alibi pales in comparison to their obvious biases

22

that more strongly discredited their testimony.  The evidence showed that

Williams had been a friend of petitioner's for approximately three to four years (*see*

Exh M, R. 1156), and at the time, Coleman was his fiancé and mother to his son.

*Id*. at 1166.  The state supreme court found that those reasons gave each

motivation to lie.  *See* Exh. D, 718 N.E.2d at 77.  Petitioner cannot make a credible

claim that had they mentioned petitioner's alibi to law enforcement, Williams and

Coleman's testimony, in light of such biases, would have been viewed more

favorably by the jury than the unequivocal testimony of the eyewitness, TQ, and

other inculpatory evidence.

Petitioner's claim of prejudice is an especially thin reed upon which to rely

when compared to instances where the Seventh Circuit found *Strickland* prejudice.

In *Hampton v. Leibach,* 347 F.3d 219 (7th Cir. 2003), the petitioner was convicted

of a deviate sexual assault at a concert inside a crowded amphitheater where he

and as many as 40 others descended upon two female victims and their male

companions.  *Hampton*, 347 F.3d at 221-22.  One of the victims and a security

guard identified Hampton as the assailant after seeing the assailant's face for only

four to five seconds; the other victim also identified Hampton, though she "could

not estimate how long she had seen" him and "indicated that there were many men

who were attacking her."  *Id.* at 224-25.  At trial, Hampton's attorney emphasized

the vulnerabilities of the witnesses' identification testimony but did not "elicit any

testimony that [petitioner] was *not* among the group of individuals who attacked

the three victims." *Id.* at 250 (emphasis in original). During state postconviction proceedings, however, petitioner submitted an affidavit averring that prior to trial, he informed trial counsel of the existence of three witnesses who could have testified that Hampton did not participate in the attack. *Id.* at 227. Hampton also submitted affidavits from two of those witnesses indicating that he was not involved in the attack. *Id.*

The Seventh Circuit affirmed the grant of habeas relief on Hampton's claim that trial counsel was ineffective for failing to investigate his exculpatory occurrence witnesses. *Id.* at 257. The court's holding that the state appellate court unreasonably applied *Strickland*'s prejudice prong was grounded in two key findings: (1) the prosecution witnesses "saw the assailant they identified as [petitioner] only briefly and under difficult circumstances, rendering their identifications of [petitioner] vulnerable to challenge;" and (2) the availability of "eyewitnesses who would have testified that [petitioner] did not participate in the attacks." *Id.* at 253. Petitioner cannot credibly make either argument here.

The identification by TQ was not vulnerable to the kind of challenge made to the witnesses in *Hampton.* There, two of the witnesses had seen the assailant for a matter of seconds and the third was not sure how long she saw him, testifying vaguely that "a number of men" were attacking her. *Id.* at 224-25. The potential for mistaken identification was significant, as the amphitheater was crowded, poorly lit, and the number of potential assailants ranged from "thirty or thirty-five

24

men," (*id.* at 224), to as many as forty.  *Id.* at 222.  Here, by contrast, TQ had

known petitioner for five years, which makes her testimony that she saw and

heard him credible and believable.  Further, there was only one assailant, so TQ

was obviously not distracted by anybody else.  Finally, petitioner presented three

alibi witnesses for the jury to consider.

Nor does petitioner claim, as the petitioners did in *Stanley v. Bartley*, 465

F.3d 810, 813-814 (7th Cir. 2006), and *Raygoza v. Hulick*, 474 F.3d 958, 965 (7th

Cir. 2007), that counsel failed to investigate or interview the alibi witnesses;

indeed witnesses were called and testified.  The differences between *Raygoza* and

this case are striking.  In the former, the Seventh Circuit found prejudice because

"the State's case against Raygoza was not particularly strong."  *Id.* at 965.  The

eyewitnesses who could link Raygoza to the crime were gang members and a

passerby who did not see the shooter's face as the perpetrators were fleeing the

scene.  *Id.*  The court explained that it did not know if the shooter were Raygoza or

a stranger (*id.*), and emphasized that Raygoza had many potential alibi witnesses

(some of whom were not related to him) and that their stories were corroborated by

documentary evidence, such as telephone records and train tickets.  *Id.*  Here, as

noted, TQ was very familiar with petitioner and, petitioner's alibi testimony was

presented.

Unlike in *Hampton*, *Stanley*, and *Raygoza*, counsel investigated petitioner's

alibi witnesses, and called them to testify on his behalf.  In contrast to those cases,

petitioner's witnesses gave a full account of their version of his whereabouts on the night of the murder.  As the evidence of his guilt through TQ's testimony and other corroborating and inculpatory evidence was overwhelming, petitioner cannot demonstrate *Strickland* prejudice:  there is no reasonable probability that petitioner would not have been convicted had counsel not allegedly instructed Williams and Coleman to withhold their alibi evidence from law enforcement officials.

In sum, the state court's decision rejecting petitioner's ineffectiveness claim was a reasonable application of *Strickland*.   Accordingly, petitioner's claim that he was prejudiced by counsel's instructions to Williams and Coleman regarding alibi evidence is without merit under § 2254(d).

### C.     Failure to allow rehabilitation of alibi witnesses

Petitioner next claims that the trial court violated *Crane v. Kentucky*, 476 U.S. 683 (1986), when it allowed the prosecution to discredit the testimony of Coleman and Williams by eliciting that they did not tell law enforcement officials about petitioner's alibi, and then prohibiting their rehabilitation by disallowing testimony that counsel had advised them not to telling authorities.  *See* Pet. 6, §3(C).  *Crane* held that the exclusion of testimony concerning the circumstances of a criminal defendant's confession on the ground that it pertained to the question of the confession's voluntariness deprived that defendant of the right to present a

defense.  *Crane*, 476 U.S. at 690-691.  Petitioner's claim is  both procedurally

defaulted and without merit.

### 1.     Procedural default

#### a.     Relevant principles

Federal habeas review is appropriate only if the petitioner has exhausted all

available state court remedies, and in the course of those proceedings, fully and

fairly presented his constitutional claims to the state's courts.  *Farrell v. Lane*, 939

F.2d 409, 410 (7th Cir. 1991); *see Harrison v. McBride*, 428 F.3d 652, 661 (7th Cir.

2005) (petitioner must present both the operative facts and legal principles

controlling each claim); *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992) (the

procedural default inquiry focuses on whether the petitioner's federal claims were

fairly presented to the state courts).  If a habeas petitioner has procedurally

defaulted a claim, an examination of its merits is generally foreclosed.  *Coleman*,

501 U.S. at 731.  The exhaustion requirement is grounded in the principle of

comity; in a federal system the states should have the first opportunity to address

and correct alleged constitutional violations.  *Id.*

Procedural default generally occurs in either of two ways.  One involves a

petitioner who, although diligently pursuing all appeals required under state law,

nevertheless fails to raise the federal claims that he later attempts to assert as the

basis for his federal habeas petition.   *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

The second is when the state court declined to address a claim because the

petitioner failed to comply with a state procedural requirement. *Coleman,* 501

U.S. at 729-730; *Barksdale v. Lane*, 957 F.2d 379, 382 (7th Cir. 1992). A

petitioner's failure to comply with the State's procedural rules furnishes an

independent and adequate state ground that bars federal review. *Coleman,* 501

U.S. at 729-732; *Szabo v. Walls,* 313 F.3d 392, 395 (7th Cir. 2002) (a state is

entitled to treat as forfeited a proposition that was not presented in the right court,

in the right way, and at the right time).

Procedural default bars review absent a showing of cause for the default and

actual prejudice resulting therefrom. *Gray v. Netherland*, 518 U.S. 152, 161-66

(1996). A petitioner can demonstrate cause by showing that "some objective factor

external to the defense impeded [his] efforts to comply with the State's procedural

rules." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner establishes

"prejudice" if he can show "not merely that the errors at his trial created the

possibility of prejudice, but that they worked to his actual and substantial

disadvantage, infecting his entire trial with error of constitutional dimensions."

*United States v. Frady*, 456 U.S. 152, 170 (1982). Ineffective assistance of counsel

may constitute "cause." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). But

before asserting such an argument as cause to excuse a procedural default, a

petitioner must first present it as an independent claim to the state courts in one

complete round of state-court review. *Boerckel* 526 U.S. at 845. A separate

procedural default of an ineffective assistance claim asserted as "cause" for another

default precludes a federal court from considering that argument within the context of "cause and prejudice." *Edwards,* 529 U.S. at 452-453.

Alternatively, a petitioner can pursue his defaulted habeas claims by showing that a failure to consider them will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. A fundamental miscarriage of justice occurs when the petitioner can show that a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 315, 327 (1995) (quoting *Carrier*, 477 U.S. at 496); *see also House v. Bell*, 547 U.S. 518, 536-537 (2006).

## b. <u>Fair presentment</u>

To fairly present a claim, a petitioner is required to first "present the state courts with the same claim he urges upon the federal courts." *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Leiberman v. Thomas*, 505 F.3d 665, 669 (2007). In exploring whether a petitioner meets this standard, the Seventh Circuit has noted:

> [A] consideration in our fair presentment inquiry is whether [petitioner's state filings] cited either federal cases that employed constitutional analysis or state cases that applied a constitutional analysis to a set of similar facts. *See Wilson v. Briley,* 243 F.3d 325, 327 (7th Cir. 2001). However, the habeas petitioner is not limited to presenting his federal claim to the state courts by citing "book and verse" of the Constitution, *see Picard,* 404 U.S. at 278, 92 S.Ct. 509; rather, our analysis focuses on whether the petitioner has offered the operative facts and controlling legal principles of his claim to the state courts, *Anderson v. Benik,* 471 F.3d 811, 814 (7th Cir. 2006); *Verdin v. O'Leary,* 972 F.2d

> 1467, 1474 (7th Cir. 1992). So we must also inquire into
> whether the petitioner has framed his claim in the state
> proceedings in a way that brings to mind a specific
> constitutional right, and whether he has alleged a set of
> facts "well within the mainstream of constitutional
> litigation." *Wilson,* 243 F.3d at 327. In short, we assess
> whether the petitioner alerted the state court to the
> federal nature of his claim in a manner sufficient to
> allow that court to address the issue on a federal basis.
> *Verdin,* 972 F.2d at 1476.

*Lieberman*, 505 F.3d at 670. In the instant case, petitioner failed to properly alert

the state supreme court to a federal nature for his rehabilitation of witness claim

in a manner sufficient to allow it to address the issue on a federal basis.

Petitioner did not fairly present his present constitutional claim to the state

supreme court. *See* Exh. A at 73-83. Petitioner currently frames his claim under

*Crane v. Kentucky* (*See* Pet. at 6; Pet. Mem. at 7-8), but he did not mention *Crane*

in his state brief in discussing the topic of rehabilitating Coleman and Williams.[7]

There, while he contended he was denied his due process right to a fair trial, the

substance of his argument was that he should have been allowed to elicit prior

consistent statements from Coleman and Williams made to petitioner's lawyer

shortly after the murders. *See* Exh. D, 718 N.E.2d at 77. In rejecting this claim,

the state supreme court held that the predicate for allowing prior consistent

statements — that the statement pre-dated the motive to fabricate — did not exist.

---

[7] Petitioner did cite *Crane* in discussing a wholly separate issue — whether
someone else might have had a motive to commit a robbery at the crime scene and
whether the murders occurred in the course of the attempted robbery. *See* Exh. A
at 110.

2.    **Merits**

Procedural default aside, the state supreme court's holding provides no ground for habeas relief.  The state supreme court held that under Illinois law (citing *People v. Harris*, 526 N.E.2d 335, 346 (Ill. 1988)), a witness may not be rehabilitated by admitting former statements consistent with trial testimony.  But an exception to this rule exists where there is a charge that the witness "recently fabricated the testimony or that the witness has a motive to testify falsely." *Id*. Under such circumstances, a prior consistent statement "may be admissible, but only if the witness makes the prior consistent statement before the motive to fabricate arose." *Id*.

The state supreme court concluded that Williams and Coleman's motive to fabricate alibi testimony existed at the time of trial, just as it did shortly after the murders.  *See* Exh. D, 718 N.E.2d at 77.  Therefore, the court held, they did not make their alleged prior consistent statements before the motive to fabricate arose, and their prior consistent statements were not admissible.  *Id*.  This holding did not violate any constitutional right.  *See Stomner v. Kolb*, 903 F.2d 1123. 1129 (7th Cir. 1990) (exclusion of prior consistent did not result in a fundamentally unfair trial).  Indeed, the federal rule on this issue is the same or virtually the same as that applied here by the state supreme court.  *United States v. Ruiz*, 294 F.3d 643, 647 (7th Cir. 2001), Fed. R. Evid. 801(d)(1)(B).

Petitioner cites *Abrams v. Barnett*, 100 F.3d 485, 493 (7th Cir. 1996), *cert. granted*, *vacated*, 521 U.S. 1114 (1997) (*see* Pet. Mem. at 6) as an example of when rehabilitative testimony was proper, but *Abrams* did not involve the issue of prior consistent statements. *Abrams* sheds no light on the issue at bar. Further, it should not be forgotten that *Abrams* was vacated and remanded in light of *Lindh v. Murphy*, 521 U.S. 320 (1997). *See Abrams*, 521 U.S. at 1114. Petitioner also cites *Kirk v. Washington*, 932 F.Supp. 1053, 1060 (N.D. Ill. 1996) for the proposition that Illinois law allows a party to put forward explanatory evidence even if it would not have been admissible initially. *See* Pet. Mem. at 6. But *Kirk* did not deal with rehabilitative testimony. There, the petitioner had testified at a first criminal trial, and the prosecution was later allowed to cross-examine him about that testimony. The habeas court concluded that "an accused cannot interject an issue into a case and then argue that it was error to bring the issue to the jury's attention," a holding that offers this petitioner no support. *Id.* Petitioner also cites *United States v. Lindeman*, 85 F.3d 1232, 1242 (7th Cir. 1996), but *Lindeman* does not concern rehabilitating a witness through prior consistent statements.

The court's rejection of petitioner's claim was not contrary to or an unreasonable application of Supreme Court case law, and did not involve an unreasonable determination of the facts. Viewed under AEDPA's lens or de novo, the state supreme court's holding on this issue provides no ground for habeas relief.

32

D.    <u>**Denial of right to fully cross-examine TQ**</u>.

Petitioner's final claim is that the trial court violated *Davis v. Alaska*, 415

U.S. 308 (1974), when it barred cross-examination of TQ as to whether Natalie and

Seals were naked in bed when petitioner shot them after TQ had testified that a

common door was open between her and Natalie's rooms.  *See* Pet. 6, §3(D); Pet.

Mem. at 8-10.  Petitioner's claim is wholly without merit.

In its opinion, the state supreme court described the factual predicate

behind this claim:

> TQ testified that, on the night of the murders, the door
> between her room and Natalie's room was open, thereby
> enabling her to see [petitioner] shoot Natalie and
> Kenneth.  The defense challenged the credibility of this
> statement by TQ in its opening statement.  Defense
> counsel stated: "[E]vidence will show the deceased, Mr.
> Seals and Natalie, are naked in bed.  Now, I would
> assume that Natalie being a good parent is not going to
> have herself naked in bed with a man and leave the door
> open so [TQ] could be watching them in bed.  The door
> would be closed.

> During the direct examination of TQ, the prosecution
> established that the door between TQ's room and
> Natalie's room was left open because the two rooms
> shared one radiator.  During [petitioner's] cross-
> examination of TQ, the following colloquy took place:

[Defense Counsel:]    Now it was your testimony, I
                      believe, that the door is always
                      open?

[TQ:]                 Right.

33

Q:                              Even when Kenneth and your mom were naked?

[Prosecutor:]                   Objection, Judge.

[Court:]                        [S]ustained, assumes facts not in evidence.

*See* Exh. D, 718 N.E.2d at 82.

Petitioner asserts that the court's ruling that he was introducing facts not in evidence was an unreasonable determination of facts because he had previously introduced evidence that they had been naked at the time of the murder.  *See* Pet. 6, §3(D); Pet. Mem. at 8-9.  Petitioner further contends that preventing cross-examination of TQ on whether the victims were naked was a direct violation of his right to confront her.  *Id.*; *Id.* at 9-10.   But petitioner has failed to show that the state supreme court's factual determinations were unreasonable or that the Confrontation Clause was violated; therefore, he is not entitled to relief

First, petitioner's claim that he was prevented from cross-examining TQ on whether the victims were naked has no basis.  He was not precluded from exploring that issue.  Rather, he was barred from assuming that the victims were naked.

Second, before the state supreme court, and in his habeas petition, petitioner alleged that the trial court's ruling ignored evidence that Natalie and Seals' nudity was already before the jury, since the trial record contained photographs of the crime scene showing the victims naked in bed.  *See* Exh. D, 718 N.E.2d at 82.  In

addition, petitioner contended a forensic investigator testified that Natalie had been found partially naked. *Id.*

But the state supreme court considered petitioner's arguments and reasonably held that the trial court had not abused its discretion in this regard. The court acknowledged that the crime scene photographs revealed Natalie to be naked from the waist down, but had not shown Seals naked as he was covered by a sheet. *Id.* Most importantly, the court noted that the investigator's actual testimony was that Natalie was wearing a nightgown without underwear, and Kenneth was wearing underwear. *Id.* (citing Exh. M, R. 879). The court concluded that the trial court's ruling on the facts in evidence was correct. *Id.* Stated another way, the state supreme court held that petitioner's claim had no basis: the evidence demonstrated that Natalie and Seals were not naked as Natalie was wearing a nightgown and Seals wore underwear.

Findings of fact, whether developed at trial or summarized on state appellate review, are entitled to deference on federal habeas review. *Rice v. Collins*, 546 U.S. 333, 338-339 (2006); *Badelle v. Correll*, 452 F.3d 648, 659 (7th Cir. 2006). If the state court's findings are supported by the record, then they are presumed to be correct. *Mendiola*, 224 F.3d at 592-593.

Petitioner has not put forward the necessary "clear and convincing" evidence showing that the state supreme court's factual determination regarding the victims' state of dress was unreasonable or even incorrect. *See* 28 U.S.C.

§ 2254(e)(1). Petitioner offers no new evidence in support of his claim, and alleges only that the record indicated that Natalie was found naked from the waist down *See* Pet. Mem. at 9.  But the state supreme court explained this victim wore a nightgown so it would be incorrect to assert she was naked.   Notably, petitioner does not mention Seals' state of dress in his filings or address the court's discussion regarding the investigator's testimony.  In sum, because petitioner offers no clear and convincing evidence to overcome the state supreme court's relevant factual findings, his assertion that the court unreasonably determined the facts fails.

Petitioner's invocation of the Confrontation Clause claim in support of his claim is unavailing.  The Sixth Amendment guarantees the right to expose, through cross-examination, a witness' bias, prejudice, or motive to testify falsely. *Davis v. Alaska*, 415 U.S. at 316 ("the exposure of a witness' motivation for testifying is a proper and important function of the constitutionally protected right of cross-examination").  That guarantee is not, however, without limitation.  *See Toliver v. Hulick*, 470 F.3d 1204, 1207 (7th Cir. 2006); *Dunlap v. Hepp*, 436 F.3d 739, 741-742 (7th Cir. 2006).  Trial judges retain "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).  Further, rulings on Confrontation Clause issues are very fact-specific and

involve case-by-case determinations.  At the same time, and perhaps for that very

reason, Confrontation Clause standards are very general, making it difficult to call

a state court ruling in this area "objectively unreasonable."  *See Walker v. Litscher*,

421 F.3d 549, 557 (7th Cir. 2005).

While not mentioning *Davis*, the state supreme court did cite to an Illinois

analog, *People v. Collins*, 487 N.E.2d 267, 281 (1985), which states that while a

party has a right to cross-examine a witness, such a right is not absolute.[8]  This

rule is consistent with the Supreme Court's Sixth Amendment precedents

governing the right to cross-examine and the limitation of that right under

appropriate circumstances.  In short, the state supreme court "applied the correct

rule — the state court identified the importance of a defendant's right to cross-

examine the witnesses against him, and it cited the correct authority governing the

exercise of that right."  *Searcy v. Jaimet*, 332 F.3d 1081, 1089 (7th Cir. 2003).

Under § 2254(d)(1)'s "unreasonable application" prong, habeas relief must be

denied unless the supreme court's holding "resulted in a decision that . . . involved

an unreasonable application of [] clearly established Federal law, as determined by

the Supreme Court of the United States."  This standard has been characterized as

---

[8]  It is of no moment in petitioner's case that the state supreme court failed to cite
*Davis* when discussing the applicable standard.  *See Mitchell v. Esparza*, 540 U.S.
12, 16 (2003) ("A state court's decision is not 'contrary to . . . clearly established
Federal law' simply because the court did not cite [Supreme Court] opinions";
indeed, "a state court need not even be aware of [Supreme Court] precedents, 'so
long as neither the reasoning nor the result of the state-court decision contradicts
them.'")

"difficult" to overcome, requiring proof that the state court decision at issue lay "well outside the boundaries of permissible differences of opinion." *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003); *see, e.g.*, *Searcy*, 332 F.3d at 1090-1092 (reversing district court's grant of habeas relief where state court's application of Confrontation Clause jurisprudence was reasonable); *Walker,* 421 F.3d at 554-557 (affirming denial of habeas relief on Confrontation Clause claim); *Owens v. Frank*, 394 F.3d 490, 501-503 (7th Cir. 2005) (same).

The state supreme court's resolution of petitioner's Confrontation Clause claim was reasonable. The court carefully considered the claim but explained that petitioner was seeking to cross-examine TQ with facts that were not before the jury. Indeed, as the court found, the evidence in the record contradicted petitioner's assertion that Natalie and Seals were naked.

When "the constitutional standard is flexible, and the state court takes the rule seriously and produces an answer within the range of defensible positions," AEDPA "requires the federal court to deny the petition." *Mendiola*, 224 F.3d at 591. Here, the result reached by the state supreme court certainly lies within "the boundaries of permissible differences of opinion," (*see Hardaway v. Young,* 302 F.3d 757, 762 (7th Cir. 2005)), given the facts before it and the Supreme Court's instruction that the right to cross-examine is subject to constraints. *See Walker*, 421 F.3d at 555. The state supreme court's holding was neither contrary to nor an unreasonable application of United State Supreme Court precedent. Accordingly,

petitioner is not entitled to habeas relief regarding his claim that he was deprived of his right to cross-examine TQ.

## <u>CONCLUSION</u>

This Court should deny the petition for writ of habeas corpus with prejudice.


August 19, 2008                    Respectfully submitted:


                                   LISA MADIGAN
                                   Attorney General of Illinois

                        By: <u>s/Russell K. Benton_____</u>
                                   RUSSELL K. BENTON, Bar # 6203142
                                   100 West Randolph Street, 12th Floor
                                   Chicago, Illinois 60601-3218
                                   PHONE: (312) 814-2113
                                   FAX: (312) 814-5166
                                   E-MAIL: Rbenton@atg.state.il.us

## CERTIFICATE OF SERVICE

      I certify that on August 19, 2008, I electronically filed respondent's **ANSWER** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, and on the same date mailed copies of this answer via the United States Postal Service to the following non-CM/ECF user:

Delbert Heard, No. B76789

Pontiac Correctional Center

700 West Lincoln Street

P.O. Box 99

Pontiac, IL 61764


By:    s/Russell K. Benton_____

Russell K. Benton, Bar # 6203142

100 West Randolph Street, 12th Floor

Chicago, Illinois 60601-3218

Phone: (312) 814-2113

Fax: (312) 814-5166

E-Mail: Rbenton@atg.state.il.us