**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. DELBERT HEARD, | ) ) ) | |
| Petitioner, | ) ) | No. 08 C 3097 |
| v. | ) ) | |
| GUY PIERCE, Warden, | ) ) | HONORABLE DAVID H. COAR |
| Respondent.[1] | ) | |

## MEMORANDUM OPINION AND ORDER

Delbert Heard, an Illinois prisoner, has filed a second amended petition for a writ of habeas corpus, and the state has answered. *See* 28 U.S.C. § 2254. For the following reasons, Heard's petition is DENIED, and the court declines to issue a certificate of appealability.

## BACKGROUND

Delbert Heard was convicted by a Cook County jury of the November 11, 1992 murders of Natalie Wilson, Kenneth Seals, and Zita Jones. Finding no mitigating factors to preclude the imposition of the death penalty, and Heard having waved a jury for his sentencing hearing, the trial court sentenced Heard to death. Heard appealed directly to the Illinois Supreme Court, which affirmed his conviction and death sentence. *People v. Heard*, 718 N.E.2d 58 (Ill. 1999). Then-Governor Ryan subsequently commuted Heard's sentence to a term of natural life. *People ex rel. Madigan v. Snyder*, 804 N.E.2d 546, 550 (Ill. 2004).

In its opinion, the Illinois Supreme Court summarized the facts of Heard's case and the evidence presented at his trial. Absent clear and convincing evidence to the contrary, this court

---

[1] Guy Pierce is currently the warden at Pontiac Correctional Center, where Heard is incarcerated. Therefore, Pierce should be substituted for Joseph Mathy as the proper respondent. *See Rumsfeld v. Padilla*, 542 U.S. 426, 434-35 (2004); *Bridges v. Chambers*, 425 F.3d 1048, 1049-50 (7th Cir. 2005).

- 1 -

must presume those factual findings to be correct. *Ben-Yisrael v. Buss*, 540 F.3d 542, 546 (7th Cir. 2008). They are as follows:

On November 11, 1992, Natalie Wilson lived in a first-floor apartment behind a storefront on 118th Street in Chicago. Her ten-year-old daughter, Tanquinka (nicknamed "TQ"), and her cousin, Zita Jones, lived with her. Kenneth Seals was Natalie's boyfriend, and she was pregnant with his child; their relationship had begun in April 1992. Previously, Delbert Heard (nicknamed "Heavy") had been Natalie's boyfriend for approximately five years. Sometime in 1992, Natalie ended her relationship with Heard.

TQ testified that around 8 p.m. on the night of the murders, Heard knocked on the front door and asked if he could come in. Natalie, Kenneth, and TQ were all in the apartment. When Natalie told Heard he could not come in, Heard replied through the door, "I'm not going to hurt you." Heard asked where TQ was, claiming that he wanted to buy some of the candy she was selling for a school fundraiser. Natalie said TQ was not home; Heard kicked the door and left.

TQ went to bed. Her bedroom was next to Natalie's, and a common door between the two rooms was—as always—left open because they shared a single radiator located in Natalie's room. Later on, TQ heard the side door unlock. Zita and her boyfriend, talking and laughing, went into Zita's bedroom. TQ later heard them walk back to the side door and unlock it. Then the door locked again and Zita walked back to her bedroom alone.

As TQ was going back to sleep, she heard the door unlock again, this time slowly, and she heard the floor squeak. TQ saw Heard standing at the foot of Natalie's bed. He exchanged words with Natalie and Kenneth, and said to them, "don't try it." TQ heard 25 or 30 gunshots coming from her mother's room, and she saw Heard lean over Natalie and Kenneth. He had a long black gun, and sparks were coming from it. TQ heard Zita scream as the floor squeaked

again. Heard went into Zita's room, and TQ heard more gunshots. Then she heard the floor squeaking very fast and the outside gate rattling.

TQ went into Natalie bedroom. She asked her mother if she was okay, but Natalie did not respond. Kenneth had been moaning, but the moaning stopped. TQ then went to Zita's room. Zita was lying down with "a hole in her head" and "stuff coming out of her neck." TQ called the police and ran upstairs to get help from the landlords, Monique and Melvin DeYoung.

Mrs. DeYoung testified that on the night in question, she and her husband were awakened by gunfire. She heard heavy footsteps and then heard the kitchen door to Natalie's apartment slam. Someone on the first floor was moaning. TQ came upstairs to her bedroom. She was shaking, and her eyes were "bugged." TQ told Mrs. DeYoung that "somebody shot my mama" and that "something" was coming out of Natalie's eye. TQ had tried to wake Natalie and Kenneth, but Natalie would not wake up, and Kenneth just said "huh" and then died. TQ told Mrs. DeYoung that she then went to Zita's room, but Zita, too, was dead and had "something" coming out of her eye.

TQ and Mrs. DeYoung went to Natalie's apartment. Police officers and paramedics were already there. TQ tried to get back to Natalie, but the officers would not let her. TQ became very upset and Mrs. DeYoung heard her say to herself, "Man, why did Heavy shoot my mama?" When Mrs. DeYoung asked TQ if she saw Heard, TQ said, "Man, why did he shoot my mama? I didn't see nothing. I didn't see nothing Mrs. DeYoung." Mrs. DeYoung described TQ as "very shaken," "concerned," "frightened," and "in shock."

Mary Pearson, Natalie's sister-in-law and the common-law wife of Heard's cousin, also arrived on the scene. She testified that TQ ran to her and said, "Auntie Net, he gon killed my mother." When Mary asked TQ who killed Natalie, TQ hugged Mary but did not answer the

question. Mary and TQ then went with detectives in an attempt to find Heard at his house, at his parent's house, at his sister's house, and at the garage where he parked his tow truck. At each location, TQ laid down in the backseat of the car as if she did not want to be seen. When the detectives pulled up in front of Heard's parents' house, TQ told Mary, "He gon see us," and began to cry. The next day, Heard learned that the police were looking for him, and he went to the police station.

John Butler, a CPD forensic investigator, testified regarding his processing of the crime scene. In one bedroom, Natalie and Kenneth's bodies were on the bed. In a second bedroom, Zita's body was on the bed. The victims had been shot numerous times, and total of 32 cartridge cases were recovered, all 9-mm Luger FCs. The police found a set of keys in the outside kitchen door, but no usable fingerprints were discovered on them. The police also found a Taurus .380 semiautomatic pistol on the window sill near Kenneth's body. Assistant Chief Medical Examiner Dr. Mitra Kalelkar testified that Natalie and Zita were each shot 5 times, and Kenneth was shot 17 times. Natalie was six to eight weeks pregnant.

After the prosecution rested, Heard presented the testimony of Alonzo Williams (Heard's friend), Tina Coleman (Heard's fiancée), and Kimberly Nelson (Coleman's sister). Williams and Coleman testified that Heard was with them on the night of the murders. They went to the Miami Bowl around 9:30 or 10:00 p.m. and stayed until roughly 1:30 a.m., when they went to Denny's. Heard and Coleman left Denny's together sometime after 2:00 a.m. Coleman testified that the two of them spent the rest of the night together at the Avenue Hotel, since Heard had out-of-town guests staying the night at his home. They left around 7 a.m. Coleman further testified that when she received a page from her sister, Kimberly Nelson, at around 1:30 a.m., she returned the call. She was at the Miami Bowl at the time. Nelson testified that when she

spoke to Coleman, she heard bowling pins in the background. She could also hear Heard's voice. He was saying something about turkey, and Coleman had to explain to her that that term has a special use in the context of bowling.

Additional facts beyond those summarized by the Illinois Supreme Court, as gleaned from this court's review of the trial transcript and the state courts' analyses of Heard's arguments, will be presented below as they become relevant to the disposition of Heard's claims.

Heard raised numerous arguments on direct appeal to the Illinois Supreme Court, which affirmed his conviction and death sentence on June 17, 1999. *See Heard*, 718 N.E.2d at 68-87. On March 6, 2000, the United States Supreme Court denied Heard's petition for a writ of certiorari. *Heard v. Illinois*, 529 U.S. 1004 (2000). Heard, *pro se*, filed a postconviction petition; the Circuit Court of Cook County denied the petition, and Illinois Appellate Court affirmed. *People v. Heard*, No. 1-05-0209 (Ill. App. Ct. 2007) (modified order upon denial of petition for rehearing). On May 31, 2007, the Illinois Supreme Court denied Heard's PLA. *People v. Heard*, 871 N.E.2d 58 (Ill. 2007).

On May 28, 2008, Heard timely filed his present petition for a writ of habeas corpus in this court. Heard advances three claims: (1) trial counsel was ineffective for (i) failing to request IPI Criminal No. 3.15, and (ii) instructing Williams and Coleman not to apprise the police or prosecutors of his alibi in January 1994; (2) he was denied due process when the trial judge barred Williams and Coleman from testifying that Heard's lawyer had instructed them not to go to the police; and (3) his Sixth Amendment right to confrontation was denied when the trial judge limited his cross examination of TQ. The State concedes in its answer that all of Heard's claims were fully and fairly presented to the state courts. Thus, procedural default is not at issue, and the court reaches the merits of each of Heard's claims below.

## LEGAL STANDARD

"A district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the grounds that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the court may issue a writ of habeas corpus only if the state court's determination of the petitioner's claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)&(2); *Woods v. McBride*, 430 F.3d 813, 816 (7th Cir. 2005).

## ANALYSIS

### *Counsel's Failure to Request IPI Criminal No. 3.15*

Heard contends that trial counsel was ineffective for failing to request IPI Criminal No. 3.15. To prevail on an ineffective-assistance claim, Heard must show that show that 1) his attorney's performance was objectively unreasonable, and 2) there is a reasonable probability that, but for his attorney's purported errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Citing *Strickland*, the Illinois Supreme Court summarily rejected Heard's claim for failure to establish prejudice. *Heard*, 718 N.E.2d at 84. Since that determination was not unreasonable—and since counsel was not deficient in the first place—Heard is not entitled to habeas relief.

IPI Criminal No. 3.15 was drafted to provide guidance to juries charged with assessing the reliability of eyewitness identifications. To this end, it codified the factors that have long

been considered salient in both federal and Illinois case law. *People v. Slim*, 537 N.E.2d 317, 319 (1989) (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)). Thus:

> When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following: [1] The opportunity the witness had to view the offender at the time of the offense, or [2] The witness's degree of attention, or [3] The witness's earlier description of the offender, or [4] The level of certainty shown by the witness when confronting the defendant, or [5] The length of time between the offense and identification confrontation.

IPI Criminal No. 3.15 ("Circumstances of Identification") (3d ed. 1992). The Committee Notes instruct trial judges to "[g]ive numbered paragraphs that are supported by the evidence." *Id.* Heard argues that [5] should have been given: fourteen months passed between the murders and the time TQ first told the state's attorney and the police that he was the shooter; thus, the jury should have been instructed to consider the length of time between the offense and the identification as relevant to the reliability of the latter. And since TQ's statement identifying Heard as the shooter was the State's principal evidence at trial, Heard argues that counsel's failure to request IPI 3.15[5] was prejudicial and denied him a fair trial. This argument is patently without merit.

IPI 3.15[5] was not applicable to TQ's so-called identification of Heard. By its terms, IPI 3.15[5] applies where a witness identified the defendant at an "identification confrontation;" that is, it applies to line-ups and show-ups. *See, e.g.*, *Slim*, 537 N.E.2d at 322-23. In that context, a substantial lapse of time can raise doubts about the witness' ability to remember the offender with enough accuracy and detail to make a reliable identification. But TQ did not ID Heard at a line-up or show-up. Indeed, she didn't have to, as she had known him for five years prior to the murders. Rather, her "identification" of Heard was in fact a statement to an assistant state's attorney and later to the police—made during an interview conducted pursuant to the investigation of an earlier shooting case involving Heard—that Heard was the shooter. Since

there was no identification confrontation, IPI 3.15[5] was not "supported by the evidence," and there was no reason to give this instruction to the jury. Therefore, counsel could not have been deficient for failing to request it, and Heard could not have been prejudiced by the lack of it.

Heard's first argument contributes nothing to his claim that counsel's allegedly deficient performance, taken as a whole, deprived him of a fair trial. *See, e.g.*, *Raygoza v. Hulick*, 474 F.3d 958, 963 (7th Cir. 2007) ("It is counsel's performance as a whole that matters . . . ."). But Heard offers another reason why counsel was ineffective. The court takes up that argument in conjunction with his due-process claim, since both relate to the impeachment and rehabilitation of his alibi witnesses at trial.

### *Impeachment and Rehabilitation of Alibi Witnesses*

Heard's second and third grounds for relief arise from the impeachment and attempted rehabilitation of his alibi witnesses. Heard contends (i) that counsel was ineffective for instructing Williams and Coleman not to apprise the authorities of his alibi, thus setting up their eventual impeachment at trial; and (ii) that he was denied due process because Williams and Coleman were not allowed to testify, by way of rehabilitation, that defense counsel had instructed them not to go to the police. Heard's arguments are unavailing.

Heard's principal defense at trial was the alibi testimony of Williams, Coleman, and Nelson. On cross examination of Williams and Coleman, the State brought out that neither one had ever conveyed Heard's purported alibi to the authorities. (The State did not cross examine Nelson). Williams and Coleman both testified—by way of nonresponsive answers to the State's questions—that they conveyed their account of events to Heard's attorney in January 1994. On redirect, Heard's lawyer sought to re-elicit their testimony that they told him about Heard's alibi in January 1994. The judge sustained the State's objection to this testimony during redirect of

Williams. During redirect of Coleman, defense counsel asked her when she first revealed to someone that Heard was with her on the night of the murders, and the State again objected. After a lengthy sidebar, the judge barred Coleman from further testifying that she informed Heard's lawyer of his alibi in January 1994—testimony that the jury had, in substantial measure, already heard. The judge reasoned that Coleman's prior consistent statements to counsel would be admissible only to rebut a charge of recent fabrication, and then only if the statements were made before the motive to lie arose. *See Heard*, 718 N.E. at 77 (citing *People v. Harris*, 526 N.E.2d 335 (Ill. 1988)). That was not the case here, since Coleman and Heard were already engaged at the time Coleman allegedly approached counsel with an alibi for Heard. Likewise, as the Illinois Supreme Court noted, Williams and Heard were already friends at that time. *Heard*, 718 N.E.2d at 77.

There was also some tangential discussion of what counsel said to Williams and Coleman when they approached him. On three occasions, counsel noted that he did not intend to question Coleman about he had said to her. As he explained, he merely wanted to elicit further testimony that she had in fact conveyed Heard's alibi to someone—in fact, someone she viewed as in a position of authority—as early as January 1994, in order to dispel the State's clear implication that the alibi was a recent fabrication. So first, counsel said, "I won't ask her what I said to her. My question is did she tell someone." And, "I'm not going to go into what the lawyer said to her, that would clearly be hearsay, but the fact is she did tell somebody and she didn't just remain mute until the day of trial . . ." Finally, counsel spilled the beans himself: "I'm not arguing we can go into the substance of what she said or the response of the attorney, which was, of course, don't say anything to anybody, we need it for trial, I'm not going to ask her that." The judge reassured the State that there would be no testimony regarding counsel's instructions to

Williams and Coleman.

The court begins with Heard's second argument: that he was denied due process because he was not allowed to rehabilitate Williams and Coleman by eliciting testimony that his lawyer instructed them not to go to the police. Evidentiary rulings are, in the first instance, matters of state law that do not support a writ of habeas corpus unless the error is so prejudicial that it violates fundamental due process. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The Illinois Supreme Court found that the alleged exclusion of rehabilitation testimony was neither improper as a matter of state law nor a denial of Heard's due-process right to a fair trial. *Heard*, 718 N.E.2d at 70.

There are two questions lurking here that should be distinguished. The first concerns the exclusion of Williams and Coleman's testimony that they told defense counsel of Heard's alibi as early as January 1994—in other words, their prior consistent statements. The second concerns the alleged exclusion of testimony as to what counsel said to them in response. The analysis of the state courts focused almost entirely on the former, that is, on whether Heard could offer prior consistent statements from Williams and Coleman to rebut the State's implication that the alibi they offered for Heard was a recent fabrication. *See Heard*, 718 N.E.2d at 77-78.

To the extent that Heard's due-process claim is based on the exclusion of Williams and Coleman's statements to defense counsel, the claim lacks any merit. Due process is not violated when a witness' prior consistent statement is excluded on the grounds that the witness already had a motive to lie on the defendant's behalf when making the statement. Indeed, the federal rule governing prior inconsistent statements reaches the same result as the Illinois rule. *See* Fed. R. Evid. 801(d)(1)(b); *Tome v. United States*, 513 U.S. 150, 156-58 (1995); *United States v. Stoecker*, 215 F.3d 788, 791 (7th Cir. 2000). Heard's attempt to dress up a garden-variety

evidentiary ruling in constitutional garb is therefore unavailing. *See Riggins v. McGinnis*, 50 F.3d 492, 494 (7th Cir. 1995) (tacking on 'due process' to state-law evidentiary issue does not create a basis for habeas relief). Nor is there anything to indicate that the state courts' factual basis for excluding this testimony—again, Williams and Coleman's relationships with Heard, thus their respective motives to lie on his behalf—involved "an unreasonable determination of the facts in light of the evidence presented" at trial. *See* 28 U.S.C. § 2254(d)(2). Thus, the exclusion of Williams and Coleman's prior consistent statements to defense counsel did not violate due-process.

Heard also contends that due process was violated when the trial judge stifled counsel's attempt to rehabilitate Williams and Coleman by eliciting testimony that he—that is, defense counsel—instructed them not to relate Heard's alibi to the police in January 1994. And since his was an "evidentially close case"—it was a credibility contest between TQ on the one hand, and Williams and Coleman on the other—there is a reasonable probability that the jury would have acquitted him, had they only known why Williams and Coleman did not go to the police.

The Illinois Supreme Court, like Heard, simply lumped counsel's statements together with the witnesses' prior statements and resolved the two issues in the same breath. *See Heard*, 718 N.E.2d at 70. Whatever the reason for this perfunctory treatment, this court's own review of the trial transcript failed to turn up clear evidence that defense counsel ever attempted this purported rehabilitation in the first place. For openers, counsel repeatedly said on the record that he did not seek to ask Coleman whether he had advised her to withhold Heard's alibi from the authorities; for better or worse, counsel himself characterized that testimony as inadmissible hearsay. So the trial judge's assurance to the State that there would be no testimony as to what counsel allegedly told Williams and Coleman did not actually exclude anything. Alternatively,

- 11 -

Heard might try to rest his claim on a truncated colloquy during redirect of Williams. After Williams testified that that he had apprised counsel of Heard's alibi, counsel began to ask, "And [counsel] advised you to speak - -," at which point the State objected. The trial judge sustained the objection. No basis for the objection or the ruling was offered on the record. In any event, this colloquy leaves the court uncertain as to what question counsel was attempting to pose. It is not at all clear that "And [counsel] advised you to speak - - " would have issued in some semantic equivalent of "Counsel advised you *not* to speak to the police." Moreover, that construal would run counter to everything else defense counsel put on the record regarding the rehabilitation of Heard's alibi witnesses. Yet this ambiguous fragment is the best Heard has to offer. To the extent that his due-process claim rests on the purported exclusion of counsel's instructions to Williams and Coleman, the claim fails for lack of an adequate factual predicate: the record does not clearly show that counsel ever attempted the rehabilitation Heard now claims was excluded in violation of due process.

Even if this fragment did provide a factual predicate for Heard's claim, due process would be violated only if Heard could demonstrate that the error "produced a significant likelihood that an innocent person has been convicted." *Anderson v. Sternes*, 243 F.3d 1049, 1053 (7th Cir. 2001). Heard cannot meet this high standard. For one thing, the State's principal evidence—TQ's statement identifying Heard as the shooter—was not tainted by the alleged error, and as the Illinois Supreme Court found, this evidence was sufficient on its own to sustain Heard's convictions. *Heard*, 718 N.E.2d at 85; *see also People v. Boyd*, 845 N.E.2d 921, 935 (Ill. App. Ct. 2006) ("A single witness identification of the accused as the person committing the crime may be sufficient proof when the witness viewed him under circumstances permitting a positive identification."). For another, the marginal impeachment value of the fact that Williams

and Coleman apprised counsel but not the authorities of Heard's alibi could only have been slight. Williams and Coleman had obvious motives to provide an alibi for Heard, and it is highly unlikely that the jury would have discounted those motives enough to acquit Heard if only they had known why Williams and Coleman did not go to the police. And since both witnesses testified that they did tell defense counsel that Heard was with them on the night of the murders, the salient point that their testimony was not a recent fabrication was made. Factual difficulties aside, Heard's due-process argument puts more weight on the (alleged lack of) rehabilitation of his alibi witnesses than it can bear. Heard cannot demonstrate a "significant likelihood" that an innocent man was convicted, and for this reason, too, he cannot prevail on his due-process claim.

These same reasons sink Heard's second attempt to make out an ineffective-assistance claim, namely, that by instructing Williams and Coleman not to go to the police, counsel "set [them] up" for impeachment and thereby prejudiced his defense. Again, the marginal impact of the State's impeachment of Williams and Coleman seems slight when viewed in the context of their overall testimony and their motive to provide an alibi for Heard. Thus, the court discerns no more than a negligible chance that the State's impeachment of Williams and Coleman carried the day with the jury.

For what it's worth, Heard never explains how or why counsel's instruction to Williams and Coleman was "objectively unreasonable." Trial counsel's decisions about whether and how to present an alibi defense are presumed to be sound tactical decisions, and absent a showing that counsel's choices were patently indefensible from the get-go, the court will defer to counsel's assessment of the risks involved in the presentation of alibi witnesses. *See Smith v. Gaetz*, 565 F.3d 346, 354 (7th Cir. 2009). Now, Heard would surely have told the police that he was bowling with his fiancée and friends at the time of the murders, if that was in fact the case, so

counsel would have expected the police to approach Williams and Coleman anyhow—unless of course they had concocted this alibi outside of Heard's presence. In light of this, counsel may well have been concerned that sending Williams and Coleman to the police at that point would accomplish little more than contradict Heard's own version of events, or lay a foundation for the eventual impeachment of Williams and Coleman by prior *in*consistent statements—particularly if he felt the alibi they were offering was flimsy, or an exercise in solidarity rather than truth-telling. Such determinations are the province of trial counsel, and Heard has not overcome the presumption that counsel acted reasonably in sizing up the risks and deciding not to send Williams and Coleman to the police prematurely. Thus, Heard has not shown that counsel was deficient, much less that the purported deficiency casts doubt on the reliability of the verdict.

Taking into account both grounds for Heard's ineffective-assistance claim, and viewing counsel's performance as a whole, this court is unable to conclude that the Illinois Supreme Court unreasonably applied *Strickland* in rejecting Heard's claim. *See Heard*, 718 N.E.2d at 84. Heard also argues that the Illinois Supreme Court applied a "heightened standard of requiring additional citation to analogous authority," but this argument is frivolous.

### *Confrontation-Clause Violation*

Heard contends that he was denied his Sixth Amendment right to confrontation when the trial judge limited his cross examination of TQ. Heard argues that the exclusion of a question posed to TQ was "contrary to the principles of due process enunciated in *Davis v. Alaska*," 415 U.S. 308 (1974), and that it "was based on an unreasonable determination of the facts." Heard's claim has no merit.

On direct examination, TQ testified that she could see Heard shoot Natalie and Seals because a common door between her room and Natalie's room (where Natalie and Seals were

shot) was open. TQ explained that the door was routinely left open because the two rooms shared a single radiator. In opening statements, defense counsel had already announced his challenge to TQ's anticipated testimony on this point: "Evidence will show the deceased, Mr. Seals and Natalie, are naked in bed. Now, I would assume that Natalie being a good parent is not going to have herself naked in bed with a man and leave the door open so Tanquinka could be watching them in bed. The door would be closed." On cross examination, after TQ testified that the door between the rooms was always open, defense counsel asked, "Even when Kenneth and your mom were naked?" The court sustained the State's objection on the grounds that defense counsel's question assumed facts not in evidence.

Heard argues that the trial judge's ruling, as upheld by the Illinois Supreme Court, was based on an unreasonable determination of the facts, because he had previously introduced evidence that Natalie and Seals were naked at the time of the murder. Specifically, Heard maintains that the state courts ignored crime-scene photographs and testimony from a forensic investigator establishing that Natalie and Seals were "in fact naked or somewhat naked." But the crime-scene photographs (1) revealed nothing about Seals, since his body is covered by a sheet in the photo; and (2) showed Natalie "naked from the waist down." *Heard*, 718 N.E.2d at 82. This description was clarified by the forensic investigator's testimony that when he viewed the crime scene, Natalie was wearing a nightgown without underwear. He also testified that Seals was wearing underwear. *Id.* Thus, Heard has not shown by clear and convincing evidence that the state courts unreasonably or incorrectly determined the facts, *see* 28 U.S.C. § 2254(e)(1), since the evidence did not in fact show that Natalie and Seals were naked when they were shot. Rather, it showed that one was dressed in a nightgown while the other was wearing underwear.

Nor has Heard shown that the state-court ruling was either contrary to or an unreasonable

application of clearly established federal law. *Davis* establishes a defendant's right to cross examine a witness for the purpose of exposing any potential bias, prejudice, or motive to testify falsely. 415 U.S. at 316 ("the exposure of a witness' motivation for testifying is a proper and important function of the constitutionally protected right of cross examination"). Whether Natalie and Seals were naked is immaterial to TQ's potential bias, prejudice, or motive for testifying. Furthermore, the trial judge limited cross examination of TQ because defense counsel's question was predicated on a distorted or at least misleading picture of the evidence, and that ruling was well within the discretion that the Confrontation Clause affords trial judges for managing cross examination. *See Dunlap v. Hepp*, 436 F.3d 738, 741-42 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (trial judges retain "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." )). Heard has not shown that his right to confront TQ was violated.

### *Certificate of Appealability*

Heard is not entitled to a certificate of appealability. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), RULES GOVERNING HABEAS CORPUS CASES (Eff. Dec. 1, 2009). A district court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Reasonable jurists would not find any of Heard's claims debatable.  *First*, counsel could not have been ineffective for failing to request a plainly inapplicable jury instruction, and as for counsel's instruction to Williams and Coleman not to go to the police, any impeachment that resulted was, at most, of slight marginal value to the State's case.  *Second*, for the same reason, Heard could not have been denied due process by the trial judge's purported exclusion of rehabilitation testimony, and in any event, Heard cannot point to an adequate factual predicate for this claim in the trial record.  *Third*, the confrontation clause obviously does not forbid a trial judge from excluding a question that misrepresents the facts in evidence.  Therefore, Heard has not shown that he is entitled to a certificate of appealability.

## **CONCLUSION**

For the foregoing reasons, Heard's petition for a writ of habeas corpus is DENIED, and the court declines to issue a certificate of appealability.

Enter:

/s/ David H. Coar

_____

David H. Coar

United States District Judge

**Dated: May 21, 2010**